# EXHIBIT 2

GOVERNMENT OF PUERTO RICO
OFFICE OF THE COMMISSIONER OF FINANCIAL INSTITUTIONS
SAN JUAN, PUERTO RICO

| | |
|---|---|
| IN RE:<br>MINT BANK INTERNATIONAL, LLC | CASE NUMBER: C18-D-001<br>RE: Application for Permit to<br>Organize an International Financial Entity |

**FINAL RESOLUTION IN RECONSIDERATION**

**I.   LEGAL GROUNDS AND JURISDICTION:**

This Resolution is issued by virtue of the power conferred to the Office of the Commissioner of Financial Institutions (OCIF [Spanish acronym]) in Act No. 4 of October 11, 1985, as amended, Act No. 273 of September 25, 2012, known as the "International Financial Center Regulating Act" (Act 273-2012), Regulation No. 5653 of July 23, 1997 (Regulation 5653) issued by OCIF and in accordance to a Act No. 52 of August 11, 1989, as amended (Act 52), known as the "International Banking Center Regulatory Act"[1], Regulation 3920 of June 23, 1989, known as Regulation to Regulate Adjudication Proceedings under the Jurisdiction of the Office of the Commissioner of Financial Institutions", as amended and in accordance to Act No. 38 of June 30, 2017, as amended, known as the "Uniform Administrative Procedure Act".

**II.   FINDINGS OF FACTS:**

1.   On May 19, 2017, Ms. Amarily Maldonado of the firm BDO of Puerto Rico, P.S.C. (BDO) filed, on behalf of the corporation Mint Bank International, L.L.C. (Mint), a Permit Application to Organize an International Financial Entity (Application) pursuant to the provisions of Act 273-2012.

2.   The Application was attached to a letter of representation signed by Mr. Miguel Carbonell of the law firm Adsuar, Muñiz, Goyco, Seda & Pérez Ochoa, P.S.C., dated May 3, 2017 (Letter), a Sworn Statement from Guy Gentile Nigro (Gentile) naming BDO Puerto Rico, PSE, as the authorized representative of Mint, and a Statement of the Personal History of Gentile duly sworn (Statement of History).

3.   In the letter, Gentile is identified as initial administrating member and director of Mint and informs that he is engaged in providing services as securities broker-dealer and investment advisor, among other things.  No other member, director or partner of Mint appears from the Application or documents.

4.   As part of the letter, it is provided that Mint, as international financial entity (IFE), intends to: (i) Accept deposits, from foreign persons in checking account as well as well as on demand or fixed

[Initials]

---

[1] Article 27 of Act No. 273-2012 sets forth, as relevant herein, that regulations approved under Act 52 shall apply to the organization and governance of IFEs.

term, including deposits on demand and deposits of funds between banks or in any other way taking money on loan from international financial entities, and from any foreign person in accordance to the Regulations of the Commissioner; (ii) Make or perform deposits in or otherwise give money on loan to the Government Development Bank for Puerto Rico, to the Economic Development Bank for Puerto Rico, to any international financial entity, or to any bank, including banks organized under the laws of Puerto Rico and branches in Puerto Rico of banks that are foreign persons; (iii) Perform any of the banking transactions allowed by the Law in the currency of any country or in gold or silver, and to participate in foreign currency trade; (iv) Underwrite, distribute or otherwise deal in securities, notes, instruments of debt, drafts, and letters of change issued by foreign persons for final purchase outside of Puerto Rico; (v) Engage in any activity outside of Puerto Rico of a financial nature that is allowed to be performed, directly or indirectly, by a banking stock holding company or foreign office or subsidiary of a bank of the United States under the applicable law of the United States; (vi) Buy and sell securities outside of Puerto Rico, to the order of, or to its discretion, for foreign persons and to provide investment advice with regards to said transactions or separate from them, to said persons; (vii) Act as a bank or clearinghouse with regards to financial

[Initials]

instruments or agreements of foreign persons, as authorized by the regulation adopted by the Commissioner; (viii) perform such other activities that are expressly authorized by the regulations or order of the Commissioner and that are incidental to the execution of the services authorized by this Act and the Regulations of the Commissioner, except activities expressly prohibited by the law; and (ix) With prior authorization of the Commissioner, provide to other international financial entities or to foreign persons outside of Puerto Rico, such services of a financial nature as they are defined and generally accepted in the banking industry of the United States and Puerto Rico and that are not numbered in Article 12 (a) of the Law.

5.      In the official form of OCIF, titled Permit Application to Organize an International Financial Entity, the applicant is advised, as in this case, that the document is an official one, and that any misrepresentation or failing to set forth the information required by the Commissioner of Financial Institutions may be sufficient cause to deny or revoke the permit or license requested. Further, the applicant is advised that the application to establish and IFE is divided in two stages, 1) Permit to organize once OCIF receives and reviews to its satisfaction, the documents and required information; and 2), Granting of a license once OCIF receives and reviews to its satisfaction the required documents. In accordance to the Sworn Statement that forms part of the Application.  Gentile swore that all information provided in the application is correct, true and complete.

6.       In the official document, titled Statement of Personal History sworn by Gentile, it is set forth that Gentile shall be the owner of 100% of Mint. Further, he answered in the affirmative that <u>some time he had been arrested, detained, accused, convicted of some crime or summoned to appear for any fraudulent act to be liable for any offense or violation of any nature</u>. See item 5, B, 2 of the Statement of Personal History.

7.       In turn, the question included in item 5, B, 4 of the Statement of Personal History requires to answer whether a competent court <u>or government entity of any country has prohibited you</u> permanently, or temporarily, <u>from participating or continuing any conduct or practice related to any business</u>. The answer to this question was negative.

8.       The Statement of Personal History further advises that if the applicant answers any question in part 8 in the affirmative, they must add the detailed information in a separate document and that if any event occurs that would cause an affirmative answer, to immediately notify it to the Commissioner. In accordance to them, Mister Gentile indicated that he had been arrested on July 13, 2012 and accused of securities fraud with regards to a "pump and dump"[2] that allegedly started early April 2007 and culminated approximately in June 2008. Mr. Gentile indicated that after being arrested, he had acted as informant for the United States Government. He testified that despite having been an informant, he was accused on March 23, 2016, and that after several procedural incidents, the charges were dismissed.  His statement ended indicating that he has always been an exemplary citizen and respectful of the law, as well as a successful entrepreneur. No other information as to that regards appears.

9.       On May 26, 2017, BDO filed a request to amend the documentation presented and it added a financial statement of Gentile and a negative criminal background check from the state of Florida, where Gentile indicated he is living at the time of applying for the permit.

10.       On June 1, 2017 Mint remitted to OCIF the payment of the non-reimbursable $5,000 charge to defray the cost of the initial investigation.

11.       As part of the process to consider the Application, OCIF investigates the history and professional background of all persons, applicants, directors and officers, or persons who intend to act in a capacity similar to the proposed international financial entity. Upon receipt of the Sworn application, of the

[Initials]

---

[2] In the "pump and dump", the promoters attempt to increase the price of stock with false or misleading statements about the company. Once the price of the stocks has been raised, the swindlers seek to obtain profit selling their own holdings in the over-evaluated stocks and once sold, the price falls and the investors lose their money. See publication made by the "United States Securities and Exchange Commission commonly known as the "SEC" by its English acronym) in <u>https://www.investor.gov/protect your-investments/fraud/types-fraud/pump-dump-schemes.</u>

documents and of the application charge presented by Mint, in accordance to our duty, OCIF performed the investigation regarding the applicant, including a review of financial solvency, credit, banking experience and commercial integrity of Mint and of Gentile as only director or officer thereof.

        12.      On June 12, 2017, OCIF performed a search on the PACER system [acronym for "Public Access to Court Electronic Records")[3]  Said search confirmed that on March 23, 2016, the United States Department of Justice had filed criminal charges against Gentile for conspiracy to commit securities fraud. In such case, under numbers 16-cr-155 and 16-cr-155 (II), the United States District Attorney's Office for the District of New Jersey filed a complaint under seal against Gentile for alleged acts of corruption to commit electronic fraud and for participating in "pump and dump" schemes that he was charged with in connection with his actions in the schemes involving Kentucky Energy, Inc. (KYUS) and Raven Gold Corporation (RVNG) occurred early April 2017 and ending June 2008, as Gentile informed in his application.

13.      As part of the investigation, OCIF obtained a document titled "Affidavit of Guy Gentile in support of his motion to dismiss" sworn by Mister Gentile on July 14, 2016 for criminal case number 16-155. In it, Gentile stated under oath, in synthesis, that:

[Initials]

       a.      That he was arrested on July 13, 2012 by the Customs and Border Patrol and delivered to the FBI
       b.      That the FBI requested his cooperation and he requested, in exchange, to have the charges witdrawn.
       c.      That he agreed to cooperate according to a Verbal Cooperation Agreement.
       d.      That he participated as informant in several schemes that entailed the arrest of several persons.

14.      According to the "Memorandum of Law in Opposition to Defendant Guy Gentile's Motion to Dismiss the Indictment" of September 23, 2016, it is established that Gentile orchestrated a multi-annual securities fraud scheme with which he benefited financially at the expense of thousands of investors. It indicates that his criminal conduct consisted in sophisticated operations designed to manipulate the market and deceive investors of two multimillion-dollar companies. It alleged that "[w]hat made Gentile such an accomplished criminal explains why he was such a valuable cooperator-he was deeply enmeshed in the world stock market manipulation". It continues indicating that:

In 2007 and 2008, Gentile and his co-conspirators engaged in an extensive pump-and-dump stock manipulation scheme involving two publicly traded companies, Raven Gold Corporation and Kentucky USA, Inc. (the "Target Companies". As part of the scheme, the conspirators first obtained control over large blocks of the free-trading shares of the Target Companies, then "pumped" the price of those shares by, among other things: (i) engaging in manipulative trading of the stocks of the Target Companies, and (ii) disseminating misleading promotional materials touting the stocks and encouraging others to purchase them.

---

[3] PACER is a public access electronic service of documents filed in the United States federal court system.

Gentile played a hands-on, high level role in this scheme and was not merely a passive participant. Indeed, Gentile controlled virtually all of the manipulative trading in the KYUS manipulation, was deeply involved in the promotional mailers that were at the center of the fraud, and was responsible for collecting and distributing millions of dollars in illicit proceeds generated by the scheme.

...On June 25, 2012, Gentile was charged in a sealed criminal complaint with conspiracy to commit wire fraud, in violation of Title 18, United States Code, Section 1349. On Friday, July 13, 2012, FBI agents arrested Gentile. Gentile quickly expressed interest in cooperating with law enforcement.

During those meetings, Gentile admitted his involvement in the pump-and-dump scheme and identified numerous others involved in similar securities fraud schemes. He claimed to have relationships with those individuals, and offered to engage in proactive cooperation against some of them. The following Monday, July 16, 2012, the Government submitted an application to the Court to dismiss without prejudice the complaint against Gentile (which had not yet been made publicly available). That day, the Court entered an order dismissing the complaint without prejudice. The purpose of dismissing the complaint was to preserve cooperation opportunities that Gentile presented over the weekend.

After the complaint was dismissed, the parties took various steps to facilitate Gentile's cooperation while protecting his interest and the Government's. For instance, because he was not subject to the supervision of the Court of Pretrial Services, the Government sought limited, reasonable assurances that he would not flee. Gentile had a fully operational broker-dealer in the Bahamas and was opening a sushi restaurant there. He also claimed to be seeking permanent residency in the Bahamas. Gentile had family in Jamaica and Italy, was a dual citizen of the United States and Italy, and had multiple passports...Gentile also agreed to turn over his passports to his attorneys and refrain from traveling internationally without the Government's consent.

Moreover, to preserve the government's ability to prosecute Gentile in the future, Gentile signed a waiver tolling "any statute of limitations" relation to the wire fraud and securities fraud statutes and related regulations...

[Initials]

...

As Gentile has conceded, during this time, the government never promised that he would not be prosecuted. To the contrary, it was always the Governments' expectation that Gentile would face criminal charges, and that fact was clearly conveyed to Gentile's experienced criminal defense counsel,...

...

...Here, the USAO was involved in Gentile's cooperation from the very beginning, making clear to him and his counsel all along that a non-felony disposition was highly unlikely. The FBI agents were supportive of Gentile's cooperation and satisfied with the results, but Gentile always understood that the decision whether to charge him with a felony rested solely with the USAO...In the Ford Letter, counsel acknowledges that Gentile had cooperated for two years "despite the absence of any assurance as to how this matter might end for him".

Said document cites the statements of a letter of October 10, 2014 signed by the Gentile's attorney, Adam Ford, and addressed to the US Attorney's Office, whereby he admits that no promise was ever made to withdraw the criminal charges, to wit:

As you and I discussed during our August 14 meeting in Newark, Gentile has been unwavering in his commitment to your office, despite the absence of any assurance as to how this matter might end for him. Indeed, in late August of this year, even after two full years of significant cooperation, and after you stated that your office would not make any commitment to exercise leniency, or indeed to do anything other than proceed with the originally contemplated felony charges, Gentile nevertheless agreed to continue his cooperation. Emphasis in the original.

15.     The search on the system reflected that the charges were dismissed on January 30, 2017, by an order of Judge José L. Linares because they were time-barred.[4]  Further, OCIF became aware of a publication of March 23, 2017, months after the charges were dismissed, titled "Bro, I'm Going Rogue': The Wall Street Informant Who Double Crossed the FBI", published by Bloomberg and whose author is Zeke Faux, who interviews Gentile and among other things, states that,

> When I called Gentile, it was as though he'd been waiting for me. He said he had an amazing story to tell, promising that it included celebrities and a government coverup. "Remember the movie _American Hustle_? It's kind of like that, with way more dirt and twists and f—ed-up shit," he said.
>
> …
>
> After the dot-com bubble burst, U.S. regulators began implementing rules to protect clueless investors from themselves, such as requiring that day traders have at least $25,000 to their names and banning funding accounts with credit cards. With the number of prospective clients declining, Gentile decided to move somewhere with fewer regulations. He set up shop in the Bahamas in November 2011. Brokers there don't have to follow day-trading rules, and they can take American customers as long as they don't advertise for them.
> …
> Gentile was allowed to remain free on $500,000 bail. He told his friends he would beat the case and met up with a rapper he'd signed to his old Miami reggae label, to make a song about snitching. On the track, Gentile raps awkwardly over a wobbly beat from a drum machine: "The feds don't know who they got, bro/ I'm going rogue."
>
> …
>
> A month after the hearing. Gentile was driving home from the gym when one of his lawyers called. The judge had tossed out the charges, saying the statute of limitations had expired. Gentile was so relieved he started crying. Then he posted a _Wolf of Wall Street_ meme on Instagram with the caption "F—YOU ALL."
> …
> Gentile isn't ready to give up the hustle. He says he intends to sue the government for damages and that one day he'd like to star in the movie of his life. His time undercover, he says, gave him the acting skills he needs. And the storyline will be straight off the posters on his office walls. "I'm going to build a billion-dollar company," he says. "I'm going to get my own private jet, I'm going to drive a flashy car. And I'm going to make my license plate F—YOUDQJ." Emphasis ours.

OCIF did not find subsequent publications wherein Gentile would have denied the statements in this publication.

16.     On the other hand, the government agency acting as a regulator of the securities industry is the "U.S. Securities and Exchange Commission", commonly known as the "SEC" for its initials in English. The "Financial Industry Regulatory Authority, commonly known by its initials in English, "FINRA") is an independent organism that regulates the securities industry operating in the United States and operates the "Central Registration Depository" (known   by   its   initials   "CRD"   and   also   "Web   CRD"),   an   online   central   storage   database

---

[4] See opinion of Judge Linares, dated January 30, 2017, in _United States of America v. Guy Gentile_, Civil Action No. 16-CR-155 (JLL), 235 F. Supp. 3d 649 (D.N.J. 2017).

[Initials]

related to securities industry registries and licenses of the United States. The system contains the records of stockbrokers and provides public access to their score histories, employment and matter subject to disclosure more than 629,000 active persons.

17.     Because according to the application, Mister Gentile has held several licenses as securities industry professional, such as, Series 7, 24, 4, 55, 63, 56, and 14, OCIF made a search on the CRD. OCIF learned that Mister Gentile with CRD number 3173560, had in his CRD a notation of judicial civil action[5] filed by the SEC on March 23, 2016 before the United States District Court for the District of New Jersey which, at the moment of the Application and of the Investigation, was pending, and had not been disclosed by Mint nor Mister Gentile in the Application. According to the CRD, the SEC alleged that it had accused Gentile of perpetrating stock manipulation schemes in violation to sections 5(a) 5(c) 17(a) and 17(g) of the "Securities Act" of 1933, Section 10(b) of the "Securities Exchange Act" of 1935, and Rule 10b-5 of the "Exchange Act", in accordance to the provisions of section 20(b) of the Securities Act of 1933, 15 USC §77t(b) and Section 21(d)1 of the Securities Insurance Act of 1934, 15 USC §78u(d)(1). The SEC alleged that Gentile, who, at that time was a stockbroker, incurred in conduct constituting penny stock manipulation based on illegal kickbacks[6] and distribution of newsletters with names of false publications to promote the stocks of a supposed gold and silver exploration company and a natural gas production company. These newsletters, the SEC alleged, deceived potential investors with supposed positive, but false, trends, of price and volume for these stocks and other information about the identity of the promoters, compensation and control of the stock. The SEC seeks a final ruling to: (a) **permanently restrict and order Mr. Gentile from being involved in acts of, practices or courses of business alleged herein**; (b) require of Mr. Gentile the return of his unlawful profits and, immediately, the payment of pre-judgment interest; (c) impose civil monetary penalties in accordance to section 20(d) of the Securities Act of 1933, 15 USC §77t(d) and Section 21(d)3 of the Securities Insurance Act of 1934, 15 USC 78u(d)(3); and (d) **permanently prohibit** Mr. Gentile from participating in any penny stock offer in accordance to Section 20(g) of the Securities Act of 1933, 15 US 77t(g), and Section

[Initials]

---

[5] Gentile, S.*E.C. v. Guy Gentile*, Civil Action No. 16-CV-1619 (JLL) D.N.J. 2017)
[6] "Kickback" is a colloquial term in English that refers to a negotiated bribe wherein the briber pays a commission to a third person to help him obtain a payment or benefit.  An example of this practice is when a provider who presents a fraudulent or inflated invoice to a company colludes with an employee of the company to secure the payment.  For his assistance in assuring the payment, the employee then receives some type of commission or favor.  See Wrage, Alexandra Addison, Bribery and Extortion: Undermining Business. Governments, and Security, Westport, Conn.: Praeger Security International, 2007. p. 14. Tambien Kranacher, Mary-Jo; Riley, Richard; and Wells, Joseph T. Forensic Accounting and Fraud Examination, Hoboken, N.J.: Wiley, 2010 y Campos, Jose Edgardo, The Many Faces of Corruption: Tracking Vulnerabilities at the Sector Level Washington, D.C.: World Bank, 2007.

21(d)(6) of the Securities Insurance Act of 1934, 15 USC 78u(d)(6). Our emphasis. As we indicated, that information was not provided in the Application.

18.     At the time of the Application before OCIF, on May 19, 2017, Mint knew of this civil suit, it knew that it was active and pending judicial resolution, and did not inform it as part of item 5, B, 2, nor part of item 5, B, 4 of the Statement of Personal History, despite being related to one of the activities that Mint intends to perform. Mint did **not** include information regarding it in the Application, Mister Gentile did not include information about it in his Statement of Personal History, for which OCIF, had to request Mint to submit in detail the cases pending against Mister Gentile.

19.     On June 13, 2017, the law firm with headquarters in New York, Ford O'Brien, L.L.P., by letter attached to an email, informed OCIF that in case 16 Civ. 1619, SEC v. Guy Gentile, Mr. Gentile had raised the defense of statute of limitations and understood that they could prevail in the case. The case was pending adjudication.

20.     In accordance to that, in its duty of investigating, on June 20, 2017, OCIF sent a letter to the SEC to provide us information regarding the civil case mentioned above. Afterwards, the SEC attorney, Nancy Brown, informed us that the SEC stood by the action against Gentile, 16 Civ. 1619, SEC v. Guy Gentil, was proper and was not time-barred.

[Initials]

21.     It appears from the investigation, that not only was Mr. Gentile criminally accused and released from alleged fraudulent acts in the securities industries, as Mint very well informed OCIF, rather that further, he was sued in civil action by the same regulatory agency of the securities industries, the SEC, for the scheme of 2007, and neither Mint nor Gentile disclosed this last information to OCIF, regardless of the results that the civil case would have. Just the opposite, Mister Gentile swore in the Application and in the Statement of Personal History, which are official documents of the Government of Puerto Rico, that the information provided in the documents was complete, true and accurate. Afterwards, on October 6, 2017, the SEC filed an amended complaint whereby it requested a mandate to prohibit future violations and Gentile's prohibition of participating of penny stock. Said information was not disclosed by Mint nor Gentile to OCIF. In the amended complaint, at page 22, it is alleged that:

> 83. At the same time, Gentile has demonstrated contempt for securities regulators and the importance of enforcement of the securities laws. For example, when Gentile learned that the Commission planned to pursue its action against him, Gentile wrote to the Commission staff, threatening that if the Commission pressed its claims against him, he would make sure that the staff would not be able to practice law again.

22.     After reviewing the documents and information provided, voluntarily, as well as requested, OCIF     was     not     satisfied,     Mint     and     Mister     Gentile     omitted     crucial     information     to     our

investigation in official documents of the Government of Puerto Rico. Therefore, in light of Gentile's reputation and the omission of information, OCIF determined that neither Mint nor Mister Gentile had the commercial integrity required by OCIF to operate a project of this magnitude and importance that the proposal has for the economy of Puerto Rico.

23.     Thereafter, and after completing the investigation and making the corresponding analysis, on December 12, 2017, an informal meeting was held at OCIF with Mint legal representatives in Puerto Rico, to assess the action to follow and to give Mint the opportunity of withdrawing their application.

24.     As a result of said meeting, on December 28, 2017, Mint, represented by the law firm Adsuar, Muñiz, Goyco, Seda & Pérez Ochoa, P.S.C., sent to OCIF a written communication reiterating its Application and attaching additional documentation and, including evidence of Gentile as a fireman, policeman, the tax exemption granted under Act 22-2012 by the Government of Puerto Rico and the order of Judge José L. Linares dismissing criminal case number 16-cr-155 of January 30, 2017, as well as the Opinion issued on December 13, 2017 by Judge José L. Linares, dismissing civil case number 16 Civ. 1619, SEC v. Guy Gentile. On February 2, 2018, the SEC filed a notice of appeal. This was not notified by Mint to OCIF either.

[Initials]

25.     On February 16, 2018, OCIF sent a letter to Mint, through its legal representative wherein it denied the permit requested, in accordance to the facts set forth therein performed by Mister Gentile as well as the omission of relevant information in the official government documents. In said letter, it was advised that they were entitled to us to request an administrative hearing within the term of twenty (20) days, as established in Article 3, paragraph 5 of Act No. 273-212.

26.     Mint did not exercise its right to request administrative hearing and on March 8, 2018 filed a document titled Petition for Reconsideration. Mint did not mention in its reconsideration the appeal of the SEC in the civil case even knowing the importance of keeping OCIF informed of matters that were relevant to its application. In its Petition, Mint's main arguments are the following:

A.     OCIF ACTED ARBITRARILY AND CAPRICIOUSLY BY DENYING THE APPLICATION BASED ON THAT MISTER GENTILE WAS ACCUSED ONCE, EVEN THOUGH SAID ACCUSATIONS WERE DISMISSED, GENTILE MET THE NECESSARY INTEGRITY TO BE GRANTED THE PERMIT TO ORGANIZE AN INTERNATIONAL FINANCIAL ENTITY, BECAUSE THERE IS NO CONVICTION AGAINST HIM AND SO DENYING IT WOULD BE VIOLATING HIS DUE PROCESS OF LAW.

B.     THERE ARE NO INSTRUCTIONS IN THE APPLICATION TO SUBMIT INFORMATION RELATED TO CIVIL CASES.

C.     MINT DOES NOT HAVE THE CONTINUOUS DUTY TO INFORM BECAUSE IT IS NOT YET A HOLDER OF THE PERMIT AS SET FORTH BY ARTICLE 6 OF REGULATION 5653.

D.     OCIF DOES NOT HAVE THE POWER TO REQUEST ADDITIONAL DOCUMENTS NOT DESCRIBED IN THE REGULATION, AND IF IT DOES SO, IT WOULD BE ULTRA VIRES

E.   **OCIF DOES NOT HAVE A SPECIAL POWER UNDER ARTICLE 3 OF ACT 273-212 TO GRANT PERMITS**

F.   **OCIF DOES NOT HAVE AN "OBJECTIVE TEST" TO DETERMINE WHETHER AN APPLICANT HAS THE NECESSARY INTEGRITY TO HAVE A PERMIT TO ORGANIZE AN INTERNATIONAL FINANCIAL ENTITY.**

27.     In turn, at page 8 of its Petition for Reconsideration as part of the footnote number 6, Mint indicates that:

> Here, having based its denial of Mint's Application upon a finding that Mr. Gentile lacks good character and business integrity, the government has seriously damaged his standing in the professional community. Establishing an International Financial Entity is an advancement in Mr. Gentile's chosen profession precisely because it denotes a particular status. Without this approval from OCIF, Mr. Gentile is limited in his ability to advance professionally. The discovery that his application was denied may well cost him continued employment in this field altogether. The government's action -- and the reasons for its action -- create a (groundless) presumption that Mr. Gentile is professionally unfit, and this brand he must bear with him always unless OCIF rectifies its error.

28.     On March 21, 2018, OCIF notified a Partial resolution whereby it accepted the request for reconsideration presented for final resolution.

29.     As part of the process to consider the reconsideration, OCIF learned of the Opening Brief for the Securities Exchange Commission filed on May 15, 2018 before the Court of Appeals of the Third Circuit in the case *Securities and Exchange Commission v. Guy Gentile*, No. 18-1242.  The SEC alleges that if Mister Gentile is not prohibited from participating in other "penny stock" offers and is prohibited from committing future violations of securities laws, with all probability, Gentile could incur in future violations of said laws. At the time this Resolution is issued, said case is still pending being decided.

After considering the administrative record, the totality of the evidence presented by OCIF investigators as well as by the applicant, evaluating each one of the documents and arguments appearing from the Letter denying the permit to organize an international financial entity as well as the Petition for reconsideration filed by Mint, and carefully analyzing the provisions of law, for the grounds we set forth below, the Petition for Reconsideration is **Denied**.

**IIII.     CONCLUSIONS OF LAW**

Act No. 4 of October 11, 1985 (Act No. 4) creates the Office of the Commissioner of Financial Institutions, and prescribes that the Commissioner shall have "… The main responsibility of monitoring and overseeing the financial institutions that operate or do business in the Commonwealth of Puerto Rico…" 7 L.P.R.A. §2003. Likewise, Act No. 4 stipulates the powers that the Commissioner shall have, among these: (1) regulating its own procedures and work rules (2) instrumenting by regulation any provision, defining with the approval of the Board any term not defined by this

[Initials]

law or other laws that of which is its responsibility to administrate, adopt, approve, amend, or revoke such rules and regulations, orders, resolutions, and findings necessary for compliance of this law. 7 L.P.R.A. sec. 2010.

In accordance with Act No. 4, OCIF administers Act 273-2012, special law that was created to regulate the organization and operation of international financial entities in Puerto Rico authorized by the Office of the Commissioner of Financial Institutions.

Article 3 of Act 273-to 12[7] establishes the authority and duties of the Commissioner in the authorization that is granted to operate said entities. Among them, OCIF reviews and carries out investigations with regards to all applications for permits and licenses to operate international financial entities (paragraph 4, Article 3) and approving, granting conditioned approval, or denying permit applications and licenses to operate them (paragraph 5, Article 3).  Said Article 3 establishes the following:

§3082. Authority and duties of the Commissioner

(a) The Commissioner shall:

(1)…

…

(5) Approve, grant conditioned approval **or deny permit applications and licenses** to operate international financial entities; any person whose application has been denied or conditionally approved **may request a hearing pursuant to the regulation provided in §3099 of this title**. (Emphasis added)

On the other hand, Article 7 of Act 273-2012[8] reads:

§3086. Permit Application

(a) Any person who is not an individual, may apply to the Commissioner for a permit to organize an international financial entity…

(b) Every application shall include:

…

(5) The identity and background record of all proposed directors and officials or persons who intend to act in a similar function as an international financial entity.

(6) Such additional information that is required by the Regulations of the Commissioner

(c) **Upon receipt of a sworn application, of all the required documents and the charge per application, the Commissioner shall perform all necessary investigations of the applicants and the application, including a review of:**

(1) Financial solvency, credit, banking experience **and commercial integrity of the applicants, of their directors and officers or persons who intend to act in a similar function in the proposed international financial entity;**

(2) The suitability of the capital available for the operations of the proposed international financial entity;

(3) The suitability of the articles of incorporation, partnership agreement or other written document belonging to any applicant and, when appropriate, of the articles of incorporation, partnership agreement or other written document establishing the proposed international

[Initials]

---

[7] 7 L.P.R.A. §3082
[8] 7 L.P.R.A. §3086

financial entity; and

(4) The impact of the proposed international financial entity will have in the economy of Puerto Rico.

…

(e) If the Commissioner determines that the result of his investigation is favorable, **at his exclusive and entire discretion, a permit may be issued to the applicants to organize** an international financial entity, subject to such conditions at the Commissioner establishes. (Emphasis added.)

According to the dictionary of the Spanish Royal Academy, integrity refers to the quality of being morally upright and the definition of upright righteous, proven, spotless. Therefore, commercial integrity entails, among other things, honesty in businesses, without faults.

In turn, Article 6 of Regulation 5653 provides in its pertinent part:

1.…

2. **Investigation**

**The Commissioner shall investigate** the data and information contained in the application and **all such additional information he deems relevant such as**: the financial capacity and experience of the applicant entity, as well as **the character, integrity and experience or knowledge in banking or businesses at an international level of the persons who will direct it**. In every application, the Commissioner shall investigate every natural person or legal entity who directly or indirectly holds, controls, or intends to hold or control ten per cent (10%) or more of the interest in the capital of the IBE [sic] without this being understood as a limitation to the investigative power of the Commissioner.

3.…

4. **Granting or Denial of the Permit**

After the required investigation and the payment of investigation expenses, as established in above paragraph (3), **the Commissioner, at his entire discretion, shall approve or deny the permit to organize an IBE** [sic]. If the permit is granted, it shall describe the activities of which the proposed IBE [sic] may be engaged in, once the license is granted and shall include such conditions that the Commissioner deems necessary. The permit granted may not be sold, transferred, assigned, encumbered or in any way committed in favor of another person. The granting of the permit in accordance to this Article shall not give right to initiate operations until applicant obtains a license in accordance to Article 7 of this Regulation.

5.…

6. **Continuous Obligation to Inform**

The holder of the permit shall have the continuous obligation of informing the Commissioner of any material change in information submitted with the permit application. Not notifying any material change shall be just cause for the revocation of the permit.… (Our emphasis)

IV.    ANALYSIS OF THE FACTS AND THE LAW

The applicant alleges in his Petition for Reconsideration that:

[Initials]

A    **OCIF ACTED ARBITRARILY AND CAPRICIOUSLY BY DENYING THE APPLICATION BASED ON THAT MISTER GENTILE WAS ACCUSED ONCE ALTHOUGH SAID ACCUSATIONS WERE DISMISSED. MISTER GENTILE MEETS THE NECESSARY INTEGRITY TO GRANT THE PERMIT TO ORGANIZE AN INTERNATIONAL FINANCIAL ENTITY, BECAUSE NO CONVICTION EXISTS AGAINST HIM AND IN SO DENYING IT, HIS DUE PROCESS WOULD BE VIOLATED.**

In first place, it does not appear from the denial letter that OCIF concluded that Gentile had incurred in conduct prohibited by law. However, OCIF exercised its discretion and investigated Mr. Gentile's reputation and commercial integrity according to the information submitted by Mint and Mister Gentile, themselves, in the application. In accordance to that, we determined that in the joint analysis of the totality of the circumstances present in this case, it is not proper to grant a permit to organize an international financial entity for the following reasons:

1.    Mint omitted information regarding the civil action of the SEC filed against Gentile:
2.    Mint will be engaged, among other things, to the securities industry, whose only member has a character and reputation at present questioned by other agencies related to the securities and financial industry, such as the SEC which inures in that he does not have the commercial integrity to carry out the business;
3.    Mister Gentile alleges that he reached an agreement with the Government but the government contradicts him
4.    Although Mister Gentile cooperated with the Government, his actions resulted in a Grand Jury filing criminal charges against him again;
5.    after the criminal charges were dismissed, Mister Gentile participated in an interview wherein he made statements that undermined his alleged good reputation, as submitted in the evidence presented regarding the Firefighter Corps and the Police, because he has expressed himself disrespectfully and using lewd language;
6.    as a result of the interview performed by the Bloomberg newspaper reporter, Mister Gentile allowed, as part of the news, the reporter indicating that in the Bahamas, they need not follow daily rules of securities exchange, and Gentile did not clarify that those were not his statements or insinuations;
7.    Mister Gentile omitted information fundamental and relevant to the Government of Puerto Rico and OCIF does not trust that Mint will act with the transparency that OCIF expects from its regulatees.

These facts inure and OCIF's belief that Mint and Mister Gentile may have the commercial integrity and capacity, honesty, and righteousness to adequately comply with OCIF requirements and legal provisions regulating the operations of an international financial entity.

OCIF acknowledges that the causes of criminal action were dismissed because of the statute of limitations, but what OCIF is not satisfied with is with Mister Gentile's reputation and integrity not only for having omitted information under oath in the Application, rather also because his reputation is tainted. Despite having prevailed from the criminal charges, Gentile shows not having professional capacity or character by stating that he is now "rogue", which is defined in English as "dishonest, no longer obedient", and by making statements that undermine his professionalism, such as:

-"Remember the movie _American Hustle?_ It's kind of like that, with way more dirt and twists and f—ed-up shit".

-"The feds don't know who they got, bro/ I'm going rogue." See Bloomberg Interview.

-Then he posted a _Wolf of Wall Street_ meme on Instagram with the caption "F— YOU ALL." See Bloomberg Interview.

[Initials]

-"I'm going to get my own private jet, I'm going to drive a flashy car. And I'm going to make my license plate F—YOUDOJ." See Bloomberg Interview.

-He says he intends to sue the government for damages. See Bloomberg Interview.

-Gentile wrote to the Commission staff, threatening that if the Commission pressed its claims against him, he would make sure that the staff would not be able to practice law again. See Amended Complaint of the SEC.

Since Mint did not request the holding of an administrative hearing to present evidence in his favor and to clarify the facts that provoke doubt on OCIF regarding the convenience of granting the permit to operate a business that will carry out tasks related to the securities market and management of customer accounts, as was advised, OCIF based itself then in the administrative record. Therefore, OCIF has not violated due process of law. On the contrary, as a result of having performed all due process of law is that OCIF is in a position of denying the permit.

OCIF established that its grounds to deny the Permit Application to Organize an International Financial Entity was its duty to investigate and its discretion to be satisfied with the information obtained. OCIF was not satisfied. On the contrary, from the record and from the investigation, it appears that Gentile had been arrested, as he confessed, he participated in several schemes, as he confessed, and after his cooperation in March 2016, criminal charges were filed. Further, Mint failed in satisfying to the Commissioner by omitting information in the Application as well as in the Statement, both sworn as complete and correct of a civil case that Mister Gentile had pending regarding the criminal case that was dismissed and which facts are closely related to the securities industry which Mint has as one of its objectives to engage in. In said case, which is on appeal, the SEC insists that Gentile must remain outside of the security industries as protection to the public. Therefore, he does not qualify for the international banking license [sic]. We must not forget that in his application one of the businesses which the international financial entity intends to engage in is "… (iv) Underwrite, distribute and otherwise deal in securities, notes, instruments of debts, drafts and letters of change issued by a foreign person for the final purchase outside of Puerto Rico;… (vi) Buy and sell securities outside of Puerto Rico, or to the order of, or at his discretion, for foreign persons and to provide investment advice with regards to said transactions or separately to the same, of said persons". Therefore, it was fundamental for OCIF to be aware of any civil cause of action in which Mister Gentile's appearance, just as the Statement indicates, especially when they were related to one of the business for which the permission to organize is requested. The facts that appear from the record and the lack of transparency do not allow OCIF to trust that the applicant will maintain whole its commercial project for which it applies for the permit, which includes the handling of securities accounts of its clients.

[Initials]

B.   **THERE ARE NO INSTRUCTIONS IN THE APPLICATION TO SUBMIT INFORMATION RELATED TO CIVIL CASES.**

As grounds to omit the information regarding the Complaint of the SEC, the applicant alleges that the Application or Statement do not require informing about civil cases. The Statement is clear when establishing in item 5, B, 2 and 4 that:

2. Have you ever been arrested, detained, accused, convicted of any crime <u>or summoned to appear for any fraudulent act to be liable for any</u> offense or violation of any nature.
__X_ Yes          ____ No
...
4. Has any competent court or government entity in any country prohibited you, permanently or temporarily, from participating or continuing any conduct or practice related to any business. The answer to this question was negative.
____ Yes          ____ No

Not only did Mister Gentile have a civil action pending for which he had been summoned to answer for an alleged securities fraud through the Complaint filed by the primary agency in securities regulation (SEC) rather that also, said Complaint requested aid of the court to prohibit Gentile from continuing to incur in said conduct, language clearly established in paragraph 5, B, 2 and 4 of the Statement.

C.   **MINT DOES NOT HAVE THE CONTINUOUS DUTY TO INFORM BECAUSE IT IS NOT YET A HOLDER OF THE PERMIT AS SET FORTH BY ARTICLE 6 OF REGULATION 5653.**

The Statement and Application require that, if there is any change, to notify the Commissioner, to wit: "... If you answer any question in part B in the affirmative, add the detailed information on a separate document and <u>if any event occurs that would cause an affirmative answer, immediately notify the Commissioner</u>."

<span style="color:blue">[Initials]</span>

D.   **OCIF DOES NOT HAVE THE FACULTY OF REQUESTING ADDITIONAL DOCUMENTS NOT DESCRIBED IN THE REGULATION, AND IF IT DOES SO, IT WOULD BE ULTRA VIRES.**

Act 273-2012 establishes sets forth in its article 7, 7 LP.R.A. §3086, that:

§3086. Permit Application
(b) every application shall include:
...
       ... (6) such additional information that is required by the regulations of the Commissioner.

Article 6 of Regulation 5653 sets forth that:

       1...
       2. <u>Investigation</u>
       **The Commissioner shall investigate** the data and information contained in the application and **any such additional information he deems relevant**, such as: the financial capacity and experience of the entity...

Therefore, the regulation does not make an exhaustive list of the information that during its investigation it may request.  The OCIF investigator found information against Mister Gentile closely related to one of     the     activities     regulated     by     OCIF     and     which     Mint     intends

to engage in, information that was not disclosed in the official documents, and requested Mint to detail it.

Therefore, OCIF did not act in an *ultra vires* fashion when requesting additional information that it deemed highly

relevant regarding the civil action omitted in the Application.

> ### E. OCIF DOES NOT HAVE DISCRETIONAL POWER UNDER ARTICLES 3 OF ACT 273-2012, TO GRANT PERMITS.

Act 273-2012 and the Regulation establish the discretion to grant permits, to wit:

> §3082. Authorities and duties of the Commission
> (a) The Commissioner shall:
> (1)…
> …
> •
> (5) Approve, grant conditioned approval **or deny applications for permits and licenses** to operate international financial entities; any person whose application has been denied or conditionally approved **may request a hearing pursuant to regulation provided in §3099 of this title**. (Emphasis added.)

On the other hand, Article 7 of Act 273-2012, 7 L.P.R.A. §3086, establishes the following:

> **§3086 Permit Application**
> …
> (E) If the Commissioner determines that the result of his investigation is favorable, **at his exclusive and entire discretion, the permit to organize an international financial entity may be issued to the applicant**, subject to such conditions that the Commissioner establishes. (Emphasis added).

On the other hand, Article 6 of Regulation 5653 provides its pertinent part:

> 4. <u>**Grant or Denial of the Permit**</u>
> After the required investigation and the payment of the investigation expenses as established paragraph (3), **the Commissioner, at his entire discretion, shall approve or deny the permit to organize** an IBE [sic]. If a permit is granted, it shall describe the activities that the proposed IBE [sic] may engage in once the license is granted and shall include such conditions that the Commissioner deems necessary. The permit granted may not be sold, transferred, assigned, encumbered in any way committed in favor of another person. The granting of a permit according to this Article shall not give right to initiate operations until the applicant obtains a license in accordance to Article 7 of this Regulation.

From the analysis of the documents presented by the applicant, as well as those appearing from the

administrative complaint brought forth by our agency, it does not seem that we acted arbitrarily or unreasonably.

Moreover, without a doubt,  in harmony with the applicable statutes and regulations, OCIF has discretion to decide

whether or not it was proper to grant Mint the permit to organize and operate an international financial entity.

Thus, and in attention that Gentile, only member of Mint, was object of an administrative, civil and criminal

investigation for fraud in the securities industry, and that the civil action pending adjudication that was not

informed to OCIF at the moment the application was filed inures over the practice and operation of the industry

for which the permit is interested to being requested, our determination does not constitute abuse of discretion.

[Initials]

Therefore, the Commissioner has broad discretion under Article 3 of Act 273-2012 to "approve, grant conditioned approval, **or deny obligations of permits and licenses**" and its Article 7 reiterates the discretion of the Commissioner when "determining that the result of his investigation is favorable, **at his exclusive and entire discretion, the permit to organize may be issued to the applicants**…". If the result is not favorable, it certainly may not issue the permit.

    F.    **OCIF DOES NOT HAVE AN "OBJECTIVE TEST" TO DETERMINE WHETHER AN APPLICANT HAS THE NECESSARY INTEGRITY TO HAVE A PERMIT TO ORGANIZE AN INTERNATIONAL FINANCIAL ENTITY.**

It is by virtue of our police power that we regulate the establishment and operation of said institutions to protect the public well-being. Act 273-2012 has granted us broad discretion in the granting of permits and licenses to establish an international financial entity.

It is by virtue of that power that Act 273-2012 allows us to condition the right to obtain a permit and then a license to establish an international financial entity.  Further, OCIF as representatives of the State may require the verification of the indispensable requirements and the necessary moral solvency of the applicant corporation, shareholders, officers, directors and employees. Therefore, this case is about a permit and a license regulated by the state.

[Initials]

The legislator establishes the general rules leaving a broad margin of freedom to complement the legislative rules through the application of our experience judgment, the agency may engage in an area of administrative analysis, appreciation and discretion as long as its discretion has grounds of reasonability. Secretary of Agriculture v. Central Roig Co., 338 U. S. 604, 611; Gravy. Powell, 314 U. S. 402, 412; Board v. Hearst Publications, 322 U. S. III; Board of Governors v. Agnew, 329 U. S. 441; 58 Harv.LRev. 70, Review of Findings of Administrators, Judges, and Juries: A Comparative Analysis. The legislator has validly delegated on OCIF's "expertise" the granting and denial of such permits and licenses and we have broad discretionary powers to elucidate relevant facts and factors. We acknowledge that in turn, the Supreme Court of Puerto Rico has stated that in the exercise of our discretion, we may not violate constitutional rights of aspirants. See De Paz Lisk v. Aponte Roque, 124 D.P.R. 472 (1990). In light of the above, "[w]hen examining these rules, […] one must oversee that they do not arbitrarily deny admission to aspirants for reasons foreign to the purpose of the regulation. It is enough that there is some evidence that they are rational to sustain their validity." See San Miguel Lorenzana v. E.L.A., 134 D.P.R. 405 (1993).

Therefore, the decisions as to the granting or denial of licenses cannot be arbitrary, capricious, fraudulent or deprived of reasonable grounds on the evidence. See 33 Am.Jur. 379; McDonough v. Goodcell, 13 Cal 2d 741;  Riley v. Chambers, 181 Cal 589;  Jaffarian v. Murphy, 183 N.E. 110;  Hazel Park

Racing Ass'n v. Inglis, 58 Northwest second 241; <u>American Committee on Maternal Welfare v. Mangan</u>, 14 N.Y.S 2d 39, affirmed in 27 N.E. 2d 278-9 <u>Farrand v. State Medical Board</u>, 85 N.E. 2d 113. However, a criterion of reasonability in the exercise of administrative discretion prevails. 62 Harv.L.Rev. 1058, 1059. Because we are empowered so, agencies can demand of the aspirant a license that shows having the requirements necessary, among them, the necessary moral solvency.

We cannot disregard either that the securities industry that Gentile is engaged in is a highly specialized and regulated one that requires obtaining a license to work as a securities broker, see Uniform Securities Act, 10 L.P.R.A. §861 et seq., which is also regulated (in such field that is not preempted by federal laws) by OCIF. Therefore, OCIF has a duty of taking official knowledge of what FINRA established in Brokercheck in 1988 (then known as the Public Disclosure Program) with the objective of providing citizens with information regarding professional background, commercial practices and conduct of brokerage firms that are members of FINRA and associate persons. The information that FINRA gathers for the public through Brokercheck is available at the "Central Registration Depository" ("CRD"), an online registry of the securities industry and licenses database.  All companies that are members of FINRA, their associated persons and regulators, we report information to the CRD system through the uniform registry forms. From said registry, OCIF, in its investigative power, found information that had not been provided by the applicant in the official document regarding a civil case against Mister Gentile, only member of Mint, related specifically to the securities industry; therefore, OCIF did not arbitrarily deny admission to the applicant for reasons foreign to the purpose of the regulation.

OCIF's letter of February 18 clearly establishes that the reason to deny was <u>also</u> the absence of integrity by Mint and Gentile in omitting information in official documents, fundamental for the investigation with regards to a pending case that had not yet been dismissed and that had it not been for OCIF'S investigative techniques and the resources that we are provided as regulatory agency, we perhaps never been aware.

The letter specifically indicates that:

<u>The facts mentioned above indicate that Mister Gentile does not have the required commercial integrity</u> to organize and operate an international banking entity under Act 273. Further, <u>Mint did not mention in its application the civil complaint filed by the SEC against Mr. Gentile and it was not until the Office became aware of the situation and requested more information about the matter that Mint produced additional documents regarding the civil actions cited above. The Office understands that this fact presents an aggravating factor to the favorability of the results of our investigation, because it violates the continuous obligation of informing that Regulation 5653 imposes on applicants.</u>[9] Therefore, the current state of the law allows us to conclude

[Initials]

---

[9] Section 6 of Article 6 of Regulation 5653.

that the results of the investigation of the application are not favorable to issue the permit requested, as required by Article 7(e) of Act 273, cited above.

It appears from the facts indicated in the Letter that the information of the civil case was not submitted by neither Mr. Gentile or Mint, OCIF had to learn about it and request it; fact that, added to the close relationship of the alleged schemes related precisely to one of the businesses for which Mint requested the permit, undermines Mint's reputation, and OCIF is not satisfied to grant the permit requested.

We further highlight that in the course of our investigation, we became aware of said information on our own account, because Gentile did not completely disclose it. We understand that Mint and Gentile omitted relevant information in their permit application, which consisted of not disclosing that at the time of its filing, there was a civil court action pending in the United States District Court for the District of New Jersey filed by the SEC wherein they alleged that Mister Gentile carried out acts in violation of sections 5(a), 5(c), 17(a) and 17(b) of the "Securities Act" of 1933, Section 10 (b) of the "Securities Exchange Act" of 1934 and Rule 10b-5 of the "Exchange Act". Mister Gentile omitted relevant information to OCIF and further, offered false statements under oath, because the candidate knew that he had a complaint against him, filed by a regulatory authority, for securities fraud, closely related to one of the objectives that Mint intends to engage in. He did not inform it until OCIF let him know that it had obtained the information. Therefore, the fact of having provided to a government agency incomplete information regarding claims related to the securities industry, despite having been advised by OCIF that it could deny its application for said grounds, is sufficient for the Commissioner, in the exercise of his discretion, to deny the permit requested.

## IV.   FINAL DETERMINATION

Having evaluated the arguments and documents presented by the applicant, OCIF has discretion (conferred by law) to deny a permit taking in consideration not only the criminal accusations and administrative-civil of the only director, officer and official of Mint in the federal sphere, as elements that inures in the commercial integrity and reputation required of applicants of permits and licenses to operate an international financial entity, rather also, taking in consideration the omission of the information closely related to the businesses they intend to carry out. We understand that not complying with the criterion of "commercial integrity", as criterion of public interest that may prevail over any other factor, but also, the absence of integrity by omitting information from the OCIF, preventing the granting of the permit requested. Further, Mister Gentile, Mint representative, swore in the Application and in the Statement of Personal History, which are official documents of the Government of Puerto Rico, that the information provided was complete, true, and accurate, when it certainly was not.  For that reason, regardless of the results in favor of Mister Gentile in the criminal case or in the civil case, as well as

[Initials]

the experience and the alleged social work performed by the mister Mint [sic], OCIF cannot allow persons or entities from omitting relevant information in permit or license applications.

In accordance with the above, the Petition for Reconsideration filed is hereby **Denied** and we reiterate the denial of the permit to organize an international financial entity as requested by Mint.

**WARNINGS**

A party adversely affected by an order or final resolution of OCIF, and once exhausting all administrative reliefs determined by OCIF, including the Final Resolution issued by an Administrative Judge, may request judicial review in the Court of Appeals of Puerto Rico, within a term of thirty (30) days counted from the notice of the determination, according to what is provided in section 4.2 of Act 38 of 2017, known as "Uniform Administrative Procedure Act of Puerto Rico".

Given in San Juan, Puerto Rico, today June 5, 2018.

**BE REGISTERED AND NOTIFIED.**

[Initials]

[Signature]
**George R Joyner Kelly**
**Commissioner**

**NOTICE**

**I CERTIFY**: That today this **Resolution** has been notified by regular mail and email to Mint Bank international, L.L.C. c/o Ms. Katarina Stipec Rubio and Mr. Miguel Carbonell, PO Box 70294, San Juan, Puerto Rico 00936-8294 and by e-mail, kstipec@amgprlaw.com and .mf, mcarbonnel@amgprlaw.com.

In San Juan, Puerto Rico, today June 5, 2018.

[Signature]
**Gladys Navarro**
**Clerk**

**No.** <u>2018-091</u>  **TRANSLATOR'S CERTIFICATE OF ACCURACY**

I, Mayra Cardona Durán, of legal age, single, resident of Guaynabo, Puerto Rico, Certified Interpreter of the United States Courts (Certification No. 98-020) and certified member of the National Association of Judiciary Interpreters (Member No. 10671) member in good standing of the American Translators Association (Member No. 230112), and admitted to the Puerto Rico Bar Association (Bar No. 12390) hereby CERTIFY: that according to the best of my knowledge and abilities, the foregoing is a true and rendition into English of the original Spanish text, which I have translated and it is stamped and sealed as described therein.  This document is comprised of Twemty One (21) Pages, including this certification page, and does not contain changes or erasures.

In Guaynabo, Puerto Rico today, Tuesday, June 26, 2018.

Lcda. Mayra Cardona
BA Lit/Fr, MA Trans, JD
**United States Courts Certified Interpreter**
**NAJIT Certified Interpreter and Translator**
3071 Alejandrino Ave. PMB 306 Guaynabo, Puerto Rico 00969-7035
Tel. (787) 530-1414 Fax (787) 789-7363
e-mail: mayra@cardona.com